UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

STERLING CHIPMAN, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,

    vs.

CPI CARD GROUP INC., STEVEN
MONTROSS, DAVID BRUSH, JERRY
DREILING, BRADLEY SEAMAN,
NICHOLAS PETERS, ROBERT PEARCE,
DAVID ROWNTREE, TRICOR PACIFIC
CAPITAL PARTNERS (FUND IV),
LIMITED PARTNERSHIP, TRICOR
PACIFIC CAPITAL PARTNERS (FUND IV)
US, LIMITED PARTNERSHIP, TRICOR
PACIFIC CAPITAL, INC., BMO CAPITAL
MARKETS CORP., GOLDMAN, SACHS &
CO., CIBC WORLD MARKETS INC.,
ROBERT W. BAIRD & CO.
INCORPORATED, WILLIAM BLAIR &
COMPANY, L.L.C., RAYMOND JAMES &
ASSOCIATES, INC., SCOTIA CAPITAL
(USA) INC. and GRIFFITHS MCBURNEY
CORP.,

                    Defendants.

—————————————————————— x

:   Civil Action No.
:
:   <u>CLASS ACTION</u>
:
:   COMPLAINT FOR VIOLATION OF THE
:   FEDERAL SECURITIES LAWS
:
:   <u>DEMAND FOR JURY TRIAL</u>
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Plaintiff Sterling Chipman ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by CPI Card Group Inc. ("CPI" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of purchasers of the common stock of CPI pursuant and/or traceable to the Registration Statement, as detailed herein, issued in connection with CPI's October 8, 2015 initial public stock offering (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§11and 15 of the Securities Act [15 U.S.C. §§77k and 77o].  This Court has jurisdiction of this action pursuant to §22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

3.     Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District as two of the three co-lead book-running managers of CPI's IPO (identified below) maintain their principal places of business in this District where they acted as representatives of the other Underwriter Defendants in the IPO and conducted the IPO in large part in this District.  CPI common stock was listed on the NASDAQ in connection with the IPO, which is located in this District.  Moreover, in the underwriting agreement, Defendants CPI, the "Selling Stockholders" and the Underwriter Defendants (defined below) all expressly and irrevocably submitted to the

jurisdiction of this court in this District "over any suit, action or proceeding arising out of or relating to . . . the Prospectus, the Registration Statement, or the offering of the Shares" in the IPO.

4.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff Sterling Chipman purchased CPI common stock traceable to the IPO, and was damaged thereby.

6.      Defendant CPI, together with its subsidiaries, engages in the design, production, data personalization, packaging, and fulfillment of financial payment cards.

7.      Defendant Steven Montross ("Montross") is, and was at the time of the IPO, a member of CPI's Board of Directors and the President and Chief Executive Officer ("CEO") of CPI.

8.      Defendant David Brush is, and was at the time of the IPO, the Chief Financial Officer of CPI.

9.      Defendant Jerry Dreiling is, and was at the time of the IPO, a Vice President and Chief Accounting Officer of CPI.

10.      Defendants Bradley Seaman ("Seaman"), Nicholas Peters ("Peters"), Robert Pearce ("Pearce") and David Rowntree ("Rowntree") are, and were at the time of the IPO, members of the CPI Board of Directors, with Defendant Seaman serving as the Chairman of the Board.

11.      The defendants referenced above in ¶¶7-10 signed the Registration Statement used to conduct the IPO and are referred to herein as the "Individual Defendants."  The defendants referenced above in ¶¶7-9 are executives of CPI, participated in the roadshow to sell the IPO and are sometimes referred to herein as the "Executive Defendants."

12.     Defendants Tricor Pacific Capital Partners (Fund IV), Limited Partnership and Tricor Pacific Capital Partners (Fund IV) US, Limited Partnership, which respectively, owned 21.8 million shares (52.6%) and 12.9 million shares (31.1%) of CPI common stock prior to the IPO, are managed by Defendant Tricor Pacific Capital, Inc., a private equity firm (collectively, the "Tricor Funds Defendants"). Collectively, the Tricor Funds and related entities owned approximately 90.9% of CPI's outstanding preferred stock and 82.6% of its fully diluted common stock prior to the IPO. Defendants Seaman, Peters and Rowntree, each of whom are officers or affiliates of Tricor and served on the CPI Board at the discretion of Tricor, comprised three of the five members of the CPI Board of Directors at the time of the IPO. The Tricor Funds sold 1,899,605 shares of CPI in the IPO, receiving approximately $19 million in proceeds. Following the IPO, the Tricor Funds continued to own approximately 57.5% of CPI common stock. By virtue of their stock ownership and their designation of the majority of the members of the CPI Board, and stated in the Registration Statement (defined below), the Tricor Funds Defendants controlled CPI at the time of the IPO.

13.     Defendants BMO Capital Markets Corp. ("BMO"), Goldman, Sachs & Co. ("Goldman"), CIBC World Markets Inc. ("CIBC"), Robert W. Baird & Co. Incorporated, William Blair & Company, L.L.C., Raymond James & Associates, Inc., Scotia Capital (USA) Inc. and Griffiths McBurney Corp. are investment banking firms that acted as underwriters of the IPO, helping to draft and disseminate the IPO documents. These defendants are referred to herein as the "Underwriter Defendants." Underwriter Defendants BMO and Goldman, both headquartered in this District, along with CIBC (headquartered in Canada), served as the co-managing bookrunners of the IPO and as representatives of the Underwriter Defendants. The Underwriter Defendants are liable for the defective Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and shared more than $8.625 million in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize CPI stock in the IPO. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and the Executive Defendants, met with potential investors and presented highly favorable information about the Company, its operations, and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from CPI that CPI would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that CPI had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted CPI and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of CPI, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning CPI's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with CPI's management, top executives and outside counsel and engaged in "drafting sessions" between at least May 2015 and October 2015. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which CPI stock would be sold;

(iii) the language to be used in the Registration Statement; (iv) what disclosures about CPI would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.   As a result of those constant contacts and communications between the Underwriter Defendants' representatives and management and top executives, the Underwriter Defendants knew, or should have known, of CPI's existing problems as detailed herein.

        (e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class.

14.     The Underwriter Defendants together with the Individual Defendants are sometimes referred to herein collectively as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

15.     CPI was founded in 2007 as CPI Holdings I, Inc. and changed its name to "CPI Card Group Inc." in August 2015, just prior to the IPO.

16.     The Company is a leading provider of payment card production and related services, offering a single source for credit, debit and prepaid debit cards including "EMV" (Europay, MasterCard and Visa) chip, personalization, instant issuance, fulfillment and mobile payment services.   "EMV" is a technical standard for smart payment cards and for payment terminals and automated teller machines that can accept them.   EMV cards are smart cards (also called "chip cards" or "IC cards") which store their data on integrated circuits rather than magnetic stripes, although many EMV cards also have stripes for backward compatibility.   They can be contact cards that must be physically inserted (or "dipped") into a reader, or contactless cards that can be read over a short distance using radio-frequency identification ("RFID") technology.   Payment cards that

- 5 -

comply with the EMV standard are often called chip-and-PIN or chip-and-signature cards, depending on the exact authentication methods required to use them.

17.     CPI operates in three segments: U.S. Debit and Credit, U.S. Prepaid Debit, and U.K. Limited.

18.     The U.S. Debit and Credit segment produces financial payment cards and provides integrated card services to card-issuing banks in the United States.  Its products include EMV and non-EMV credit cards, debit cards, and prepaid debit cards issued on the networks of the payment card brands, as well as private label credit cards and instant issuance systems.  This segment also provides various integrated card services, including card personalization and fulfillment services, and instant issuance services.

19.     The U.S. Prepaid Debit segment primarily provides integrated card services comprising tamper-evident security packaging services, and card personalization and fulfillment services to prepaid debit card issuers in the United States.  This segment also produces financial payment cards issued on the networks of the payment card brands.

20.     The U.K. Limited segment primarily produces retail gift and loyalty cards for customers in the United Kingdom and Europe.  This segment also provides card personalization, packaging, and fulfillment services.

21.     CPI markets its products and services to national and regional banks, independent community banks, credit unions, managers of prepaid programs, group service providers, and card processors through field-based sales representatives in North America, Western Europe, the United Kingdom, and Canada.

22.     CPI generally recognizes revenue related to sales of its products immediately upon shipment, except where it has entered into "bill and hold" arrangements with a customer.

23.     Until the introduction of chip & PIN cards, all face-to-face credit or debit card transactions used a magnetic stripe or mechanical imprint to read and record account data, and a signature for verification.  Under that system, the customer would hand their card to the clerk at the point of sale, who either "swiped" the card through a magnetic reader or made an imprint from the raised text of the card.  In the former case, the system verified account details and printed a slip for the customer to sign.  In the case of a mechanical imprint, the transaction details were filled in and the customer signed the imprinted slip.  In either case, the clerk verified that the customer's signature matched that on the back of the card to authenticate the transaction.

24.     The magnetic strip or mechanical imprint systems had a number of security flaws, including the ability to steal a card or to learn to forge the signature on the card.  More recently, new technology had become available on the black market for both reading and writing the magnetic stripes, making cards easy to clone and use without the owner's knowledge.

25.     EMV chip cards, invented in the early 1990s, improve security against fraud compared to magnetic stripe card transactions that rely on the holder's signature and visual inspection of the card to check for features such as a hologram.  The use of a PIN and cryptographic algorithms provide authentication of the card to the processing terminal and the card issuer's host system.  The processing time is comparable to online transactions, in which communications delay accounts for the majority of the time, while cryptographic operations at the terminal take comparatively little time.

26.     With the new EMV-chip cards, account numbers and expiration dates are not actually transmitted between customer and merchant.  The chips create a one-time code to fund transactions — information that would be useless to a thief trying to replicate cards.

27.     The supposed increased protection from fraud provided by EMV-chip cards allowed banks and credit card issuers to push through a "liability shift," such that beginning on January 1, 2015 in the European Union and on October 1, 2015 in the United States, merchants are now liable for any fraud that results from transactions on systems that are not EMV-capable, *if the issuer had issued EMV-capable cards to its customers* and the merchant had not yet adopted EMV technology. The Liability Shift was put into place to induce both issuers and merchants to rapidly adopt EMV technology.

28.     On or about May 14, 2015, CPI filed with the SEC its registration statement on Form S-1 (Registration No. 333- 206218), which, following several amendments made in response to comments received from the SEC and being declared effective by the SEC on October 8, 2015, would later be utilized for the IPO (the "Registration Statement").  On or about October 8, 2015, one week after EMV Liability Shift went into effect in the U.S., CPI and the Underwriter Defendants priced the IPO at $10 per share.  On October 9, 2015, they filed with the SEC the final prospectus for the common stock IPO (the "Prospectus"), which forms part of the Registration Statement (the Prospectus and Registration Statement are collectively referred to herein as the "Registration Statement"), and sold 17.25 million shares of CPI common stock to the investing public, 15 million of which CPI issued and sold and another 2.25 million which were sold by certain "Selling Stockholders," including Defendants Montross, Pearce and the Tricor Funds.

29.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

30.     Specifically, at the time of the IPO, CPI's largest customers of EMV cards were significantly over-inventoried with EMV cards having increased purchases in the first half of 2015 far in excess of card issuance thereby resulting in a massive backlog of cards at those larger issuer customers.  Accordingly, CPI's largest customers would significantly reduce their purchases in the fourth quarter 2015 ending December 31, 2015 ("4Q15), the remainder of the fiscal year ending December 31, 2015 ("FY15") and the fiscal year ending December 31, 2016 ("FY16") as they worked through their bloated inventories.  The Registration Statement failed to disclose these material facts.

31.     The Registration Statement represented that CPI had a "[l]eading [m]arket [p]osition with Long-Term Customer Relationships" and noted that CPI "often" has a "deep process and technology integration" with certain of its customers.  The Registration Statement stated, in pertinent part, as follows:

> *Leading Market Position with Long-Term Customer Relationships*.  We estimate that we produce approximately 35% of all Financial Payment Cards in the United States, which we believe gives us the #1 market position by unit volume.  We are a trusted partner across the markets we serve and believe we have the #1 position in the U.S. prepaid debit market (which represents the fastest growing subset of the Financial Payment Card market in the United States), serving the top five U.S. Prepaid Debit Card program managers, a leading position in the U.S. large issuer market, serving the majority of the top 20 U.S. debit and credit card issuers, and the #1 position in the highly attractive U.S. small issuer market, which includes independent community banks and credit unions, driven by our strong relationships, capabilities and technologies. As a market leader, CPI has long-standing trust-based relationships with our key customers and often deep process and technology integration, particularly in the case of customer who utilize our card services and instant issuance systems and services.  The solutions that we provide require strict data integrity, and generally card issuers are reluctant to switch away from trusted providers due to the requirements for high-security and access to highly-sensitive cardholder information.  As a result, our customers are selective about the partners with which they work and typically seek out partners who have a well-established reputation for trust and quality and are able to meet their service requirements.
>
> We serve a diverse set of over 4,000 direct and indirect customers, including many of the largest North American issuers of debit and credit cards such as JPMorgan Chase, Bank of America, American Express and Wells Fargo, as well as

- 9 -

the largest global managers of Prepaid Debit Card programs, including InComm, Green Dot, Blackhawk Network and American Express.  We have long-standing relationships with our customers, many of whom we have served for decades and provide a differentiated level of service.  We also maintain important relationships with the Payment Card Brands to ensure our facilities and processes consistently meet their standards.

32.    The Registration Statement provided CPI financial results for the first six months of

2015 stating, in pertinent part, as follows:

> For the six months ended June 30, 2015, we generated net sales of $172.8 million, which represented an increase of 80.5% as compared to the six months ended June 30, 2014, net income from continuing operations of $18.1 million, which represented an increase of 408.0% compared to the six months ended June 30, 2014 and Adjusted EBITDA of $41.9 million, which represented an increase of 183.6% compared to the six months ended June 30, 2014, representing net income from continuing operations and Adjusted EBITDA margins of 10.5% and 24.2%, respectively.

33.    The Registration Statement contained a section entitled "**Trends and Key Factors Affecting our Financial Performance**."  Under the subheading *EMV Conversion in the United States*, the Registration Statement highlighted CPI's EMV card sales stating, in pertinent part, as follows:

> During the six months ended June 30, 2015, we produced and shipped 75.2 million EMV cards, as compared to 13.9 million during the six months ended June 30, 2014.  During 2014, we produced and shipped 63.8 million EMV cards, as compared to 6.8 million during 2013.  Of the 63.8 million EMV cards we shipped in 2014 (17.7% of the total Financial Payment Cards we shipped in 2014), over 50 million were shipped in the second half of 2014.  We believe that demand for EMV cards increased sharply in the second half of 2014 primarily as a result of, among other things, the impending Liability Shift and occurrence of high-profile data breaches.  See "Industry—EMV Conversion in the United States."  We anticipate that this trend will continue and that an increasing number and proportion of the Financial Payment Cards that we ship in the future will be EMV Cards.

34.    The Registration Statement represented that CPI had experienced "significant changes to our financial profile" due to upgrade from magnetic stripe cards to EMV cards.  The Registration Statement stated, in pertinent part, as follows:

• Increased Net Sales—The conversion of non-EMV cards to EMV cards has driven growth in our net sales because EMV cards have a higher selling price than comparable magnetic stripe cards.

• Increased Cost of Goods Sold—The conversion of magnetic stripe cards to EMV cards also drove increases in our cost of goods sold as EMV cards include an integrated circuit chip assembly and may also include an RFID inlay assembly, in the case of a Dual-Interface EMV card, which meaningfully increased our cost of goods sold.

• Increased Gross Profit and Gross Profit Margin—The conversion of magnetic stripe cards to EMV cards also drove an increase in our gross profit, as the gross profit generated by an EMV card is higher than the gross profit generated by an otherwise comparable magnetic stripe card. Likewise, the conversion of magnetic stripe cards to EMV cards resulted in an increase to our gross profit margins.

• Increased Income from Operations and Operating Margin—The conversion of magnetic stripe cards to EMV cards drove an increase in our income from operations, as the increased operating expenses required to support the increased production of EMV cards was less than the incremental gross profit generated. These factors drove an increase in our operating margin.

• Increased Working Capital Investment—The conversion of magnetic stripe cards to EMV cards resulted in increased investment in working capital, particularly accounts receivable and inventory. This is a direct result of the increased levels of net sales and cost of goods sold discussed above.

• Increased Capital Spending and Depreciation—We incurred elevated levels of capital investment to prepare for the U.S. EMV conversion, including investments in our network of facilities and technological infrastructure discussed above. We anticipate spending up to an additional $10 million in capital investment during 2015 in connection with our further EMV preparation. This will utilize cash from our operations and result in additional depreciation expense in future years.

35.    The Registration Statement detailed CPI's "Growth Strategy." Among other "key components," the Registration Statement stated that the U.S. EMV conversion would increase the size of the financial payment card market. The Registration Statement stated, in pertinent part, as follows:

• *Capitalize on U.S. EMV Conversion*. The conversion to the EMV standard in the United States is expected to increase the size (measured in dollars) of the Financial Payment Card market (excluding services) from $180 million in 2013 to $1.2 billion by 2019, driven primarily by the increasing levels of card fraud in the United States, the Payment Card Brands' coordinated EMV conversion plan, including the liability

- 11 -

shift scheduled for October 1, 2015, and the need for a single global interoperable standard of card acceptance. The conversion of Financial Payment Cards in the United States from magnetic stripe technology to the EMV standard began in earnest in the second half of 2014 and is expected to continue over the next several years, with full adoption in the credit and bank debit card markets expected to be largely complete by 2017 and increasing levels of adoption of Prepaid Debit Cards and Private Label Credit Cards beyond 2017. We believe the conversion to EMV, and subsequently the expected further adoption of the more complex and higher priced Dual-Interface EMV cards, will increase the size (measured in dollars) of our estimated addressable card market by four times over the next decade.

36.     The statements referenced above in ¶¶31-35 were each inaccurate statements of material fact because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO:

(a)     that CPI's largest customers of EMV cards were significantly over-inventoried with EMV cards having increased purchases in the first half of 2015 far in excess of card issuance thereby resulting in a massive backlog of cards at those larger issuer customers; and

(b)     that as a result, CPI's largest customers would significantly reduce their purchases in the fourth quarter 2015 ending December 31, 2015 ("4Q15), the remainder of the fiscal year ending December 31, 2015 ("FY15") and the fiscal year ending December 31, 2016 ("FY16") as they worked through their bloated inventories.

37.     Pursuant to the rules and regulations governing the preparation of the Registration Statement, the Registration Statement was required to contain disclosures called for by Item 303 of Regulation S-K [17 C.F.R. §229.303]. Under Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. At the time of the IPO, unbeknownst to investors, the Company had shipped upwards of a 100 million more cards to its larger issuer customers than they were using in the 2Q15 and first part of the 3Q15, resulting in the

buildup of a massive backlog with those customers and significantly reducing their demand for additional card shipments in the 4Q15 and FY16.  The adverse events and uncertainties associated with CPI's largest customers inventory levels was reasonably likely to have a material impact on CPI's profitability, and, therefore, was required to be disclosed in the Registration Statement, but was not.

38.     The IPO was successful for the Company, the selling stockholders and the Underwriter Defendants who sold 17.25 million shares of CPI common stock, raising $172.5 million in gross proceeds (approximately $164 million net of underwriting fees and IPO costs).  Of those, CPI sold 15 million shares, receiving $150 million in gross proceeds; the Trico Funds Defendants sold 1,899,605 shares, receiving approximately $19 million in proceeds; Defendant Montross sold 87,991 shares, receiving $879,910 in proceeds; and Defendant Pearce sold 22,758 shares, receiving $227,580 in proceeds.

39.     At the time of the filing of this complaint, CPI common stock trades at about $4.70 per share -- 53% less than the $10 per share IPO price.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action on behalf of a class consisting of all those who purchased CPI common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

41.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or

thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CPI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether Defendants violated the Securities Act;

        (b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

- 14 -

**COUNT I**

**For Violation of §11 of the Securities Act
Against All Defendants (Except the Tricor Funds Defendants)**

46.     Plaintiff incorporates ¶¶1-45 by reference.

47.     This cause of action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants except the Tricor Funds Defendants.

48.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

49.     Defendants CPI and the Individual Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

50.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

51.     By reason of the conduct herein alleged, each Defendant named in this Count violated, and/or controlled a person who violated, §11 of the Securities Act.

52.     Plaintiff acquired CPI common stock traceable to the IPO.

53.     Plaintiff and the Class have sustained damages.  The value of CPI common stock has declined substantially subsequent to and due to these Defendants' violations.

54.     At the time of their purchases of CPI common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action.  Less than three

years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## COUNT II

### For Violation of §15 of the Securities Act
### Against the Company, the Tricor Funds Defendants and the Individual Defendants

55.     Plaintiff incorporates ¶¶1-54 by reference.

56.     This cause of action is brought pursuant to §15 of the Securities Act against the Company, the Tricor Funds Defendants and the Individual Defendants.

57.     By virtue of their stock ownership, their Board designees constituting a majority of the CPI Board, and their own admissions in the Registration Statement, the Tricor Fund Defendants controlled CPI and each of the Individual Defendants at the time of the IPO.  The Individual Defendants each were control persons of CPI by virtue of their positions as directors and/or senior officers of CPI.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of CPI. The Company controlled the Individual Defendants and all of CPI's employees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding rescission or a rescissory measure of damages;

D.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  June 15, 2016                ROBBINS GELLER RUDMAN
                                                          & DOWD LLP
                                                         SAMUEL H. RUDMAN
                                                         MARY K. BLASY


*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

HOLZER & HOLZER, LLC
COREY D. HOLZER
MARSHALL DEES
1200 Ashford Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: 770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| PMTS | 10/16/15 (settlement date) | 900 | $13.45 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| PMTS | | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12ᵗʰ day of May , 2016 in Salt Lake City , Utah .
                                                    City            State

(Signature) X _____

(Print Name) Sterling Chipman